BELL ATLANTIC TELEPHONE
COMPANIES, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Telecommunications Resellers
Association, et al.,
Intervenors.

Nos. 99–1094, 99–1095, 99–1097,
99–1106, 99–1126, 99–1134,
99–1136 and 99–1145.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 22, 1999.

Decided March 24, 2000.

**2**

Mark L. Evans and Darryl M. Bradford argued the causes for petitioners. With them on the briefs were Thomas F. O'Neil, III, Adam H. Charnes, Mark B. Ehrlich, Donald B. Verrilli, Jr., Jodie L. Kelley, John J. Hamill, Emily M. Williams, Theodore Case Whitehouse, Thomas Jones, Albert H. Kramer, Andrew D. Lipman, Richard M. Rindler, Robert M. McDowell, Robert D. Vandiver, Cynthia Brown Miller, Charles C. Hunter, Catherine M. Hannan, Michael D. Hays, Laura H. Phillips, J. G. Harrington, William P. Barr, M. Edward Whelan, III, Michael K. Kellogg, Michael E. Glover, Robert B. McKenna, William T. Lake, John H. Harwood, II, Jonathan J. Frankel, Robert Sutherland, William B. Barfield, Theodore A. Livingston and John E. Muench. Maureen F. Del Duca, Lynn R. Charytan, Gail L. Polivy, John F. Raposa and Lawrence W. Katz entered appearances.

Christopher J. Wright, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Laurence N. Bourne and Lisa S. Gelb, Counsel. Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, U.S. Department of Justice, entered appearances.

David L. Lawson argued the cause for intervenors in opposition to the LEC petitioners. With him on the brief were Mark C. Rosenblum, David W. Carpenter, James P. Young, Emily M. Wiliams, Andrew D. Lipman, Richard M. Rindler, Robert D. Vandiver, Cynthia Brown Miller, Theodore Case Whitehouse, Thomas Jones, John D. Seiver, Charles C. Hunter, Catherine M. Hannan, Carol Ann Bischoff and Robert M. McDowell.

William P. Barr, M. Edward Whelan, Michael E. Glover, Mark L. Evans, Michael K. Kellogg, Mark D. Roellig, Dan Poole, Robert B. McKenna, William T. Lake, John H. Harwood, II, Jonathan J. Frankel, Robert Sutherland, William B. Barfield, Theodore A. Livingston and John E. Muench were on the brief for the Local Exchange Carrier intervenors.

Robert J. Aamoth, Ellen S. Levine, Charles D. Gray, James B. Ramsay, Jonathan J. Nadler, David A. Gross, Curtis T. White, Edward Hayes, Jr., and David M. Janas entered appearances for intervenors

Before: WILLIAMS, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. §§ 151–714, requires local exchange carriers ("LECs") to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." *Id.* § 251(b)(5). When LECs collaborate to complete a call, this provision ensures compensation both for the originating LEC, which receives payment from the end-user, and for the recipient's LEC. By regulation the Commission has limited the scope of the reciprocal compensation requirement to "local telecommunications traffic." 47 CFR § 51.701(a). In the ruling under review, it considered whether calls to internet service providers ("ISPs") within the caller's local calling area are themselves "local." In doing so it applied its so-called "end-to-end" analysis, noting that the communication characteristically will ultimately (if indirectly) extend beyond the ISP to websites out-of-state and around the world. Accordingly it found the calls non-local. See *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP–Bound Traffic,* 14 FCC Rcd 3689, 3690 (¶ 1) (1999) ("FCC Ruling").

Having thus taken the calls to ISPs out of § 251(b)(5)'s provision for "reciprocal compensation" (as it interpreted it), the

Commission could nonetheless itself have set rates for such calls, but it elected not to. In a Notice of Proposed Rulemaking, CC Docket 99–68, the Commission tentatively concluded that "a negotiation process, driven by market forces, is more likely to lead to efficient outcomes than are rates set by regulation," FCC Ruling, 14 FCC Rcd at 3707 (¶ 29), but for the nonce it left open the matter of implementing a system of federal controls. It observed that in the meantime parties may voluntarily include reciprocal compensation provisions in their interconnection agreements, and that state commissions, which have authority to arbitrate disputes over such agreements, can construe the agreements as requiring such compensation; indeed, even when the agreements of interconnecting LECs include no linguistic hook for such a requirement, the commissions can find that reciprocal compensation is appropriate. FCC Ruling, 14 FCC Rcd at 3703–05 (¶¶ 24–25); see § 251(b)(1) (establishing such authority). "[A]ny such arbitration," it added, "must be consistent with governing federal law." FCC Ruling, 14 FCC Rcd at 3705 (¶ 25).

This outcome left at least two unhappy groups. One, led by Bell Atlantic, consists of incumbent LECs (the "incumbents"). Quite content with the Commission's finding of § 251(b)(5)'s inapplicability, the incumbents objected to its conclusion that in the absence of federal regulation state commissions have the authority to impose reciprocal compensation. Although the Commission's new rulemaking on the subject may eventuate in a rule that preempts the states' authority, the incumbents object to being left at the mercy of state commissions until that (hypothetical) time, arguing that the commissions have mandated exorbitant compensation. In particular, the incumbents, who are paid a flat monthly fee, have generally been forced to provide compensation for internet calls on a per-minute basis. Given the average length of such calls the cost can be substantial, and since ISPs do not make outgoing calls, this compensation is hardly "reciprocal."

Another group, led by MCI WorldCom, consists of firms that are seeking to compete with the incumbent LECs and which provide local exchange telecommunications services to ISPs (the "competitors"). These firms, which stand to receive reciprocal compensation on ISP-bound calls, petitioned for review with the complaint that the Commission erred in finding that the calls weren't covered by § 251(b)(5).

The end-to-end analysis applied by the Commission here is one that it has traditionally used to determine whether a call is within its interstate *jurisdiction*. Here it used the analysis for quite a different purpose, without explaining why such an extension made sense in terms of the statute or the Commission's own regulations. Because of this gap, we vacate the ruling and remand the case for want of reasoned decisionmaking.

\*      \*      \*

In February 1996 Congress passed the Telecommunications Act of 1996 (the "1996 Act" or the "Act"), stating an intent to open local telephone markets to competition. See H.R. Conf. Rep. No. 104–458, at 113 (1996). Whereas before local exchange carriers generally had state-licensed monopolies in each local service area, the 1996 Act set out to ensure that "[s]tates may no longer enforce laws that impede[ ] competition," and subjected incumbent LECs "to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999).

Among the duties of incumbent LECs is to "provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network ... for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2). ("Telephone exchange service" and "exchange access" are words of art to which we shall later return.)

Competitor LECs have sprung into being as a result, and their customers call, and receive calls from, customers of the incumbents.

We have already noted that § 251(b)(5) of the Act establishes the duty among local exchange carriers "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Thus, when a customer of LEC A calls a customer of LEC B, LEC A must pay LEC B for completing the call, a cost usually paid on a per-minute basis. Although § 251(b)(5) purports to extend reciprocal compensation to all "telecommunications," the Commission has construed the reciprocal compensation requirement as limited to local traffic. See 47 CFR § 51.701(a) ("The provisions of this subpart apply to reciprocal compensation for transport and termination of local telecommunications traffic between LECs and other telecommunications carriers."). LECs that originate or terminate long-distance calls continue to be compensated with "access charges," as they were before the 1996 Act. Unlike reciprocal compensation, these access charges are not paid by the originating LEC. Instead, the long-distance carrier itself pays both the LEC that originates the call and links the caller to the long distance network, and the LEC that terminates the call. See *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, 16013 (¶ 1034) (1996) ("*Local Competition Order*").

The present case took the Commission beyond these traditional telephone service boundaries. The internet is "an international network of interconnected computers that enables millions of people to communicate with one another in 'cyberspace' and to access vast amounts of information from around the world." *Reno v. ACLU*, 521 U.S. 844, 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Unlike the conventional "circuit-switched network," which uses a single end-to-end path for each transmission, the internet is a "distributed packet-switched network, which means that information is split up into small chunks or 'packets' that are individually routed through the most efficient path to their destination." *In the Matter of Federal–State Joint Board on Universal Service*, 13 FCC Rcd 11501, 11532 (¶ 64) (1998) ("*Universal Service Report*"). ISPs are entities that allow their customers access to the internet. Such a customer, an "end user" of the telephone system, will use a computer and modem to place a call to the ISP server in his local calling area. He will usually pay a flat monthly fee to the ISP (above the flat fee already paid to his LEC for use of the local exchange network). The ISP "typically purchases business lines from a LEC, for which it pays a flat monthly fee that allows unlimited incoming calls." FCC Ruling, 14 FCC Rcd at 3691 (¶ 4).

In the ruling now under review, the Commission concluded that § 251(b)(5) does not impose reciprocal compensation requirements on incumbent LECs for ISP-bound traffic. FCC Ruling, 14 FCC Rcd at 3690 (¶ 1). Faced with the question whether such traffic is "local" for purposes of its regulation limiting § 251(b)(5) reciprocal compensation to local traffic, the Commission used the "end-to-end" analysis that it has traditionally used for jurisdictional purposes to determine whether particular traffic is interstate. Under this method, it has focused on "the end points of the communication and consistently has rejected attempts to divide communications at any intermediate points of switching or exchanges between carriers." FCC Ruling, 14 FCC Rcd at 3695 (¶ 10). We save for later an analysis of the various FCC precedents on which the Commission purported to rely in choosing this mode of analysis.

Before actually applying that analysis, the Commission brushed aside a statutory argument of the competitor LECs. They argued that ISP-bound traffic must be either "telephone exchange service," as de-

fined in 47 U.S.C. § 153(47), or "exchange access," as defined in § 153(16).[1] It could not be the latter, they reasoned, because ISPs do not assess toll charges for the service (see *id.*, "the offering of access ... for the purpose of the origination or termination of telephone toll services"), and therefore it must be the former, for which reciprocal compensation is mandated. Here the Commission's answer was that it has consistently treated ISPs (and ESPs generally) as "users of access service," while treating them as end users merely for access charge purposes. FCC Ruling, 14 FCC Rcd at 3701 (¶ 17).

Having decided to use the "end-to-end" method, the Commission considered whether ISP-bound traffic is, under this method, in fact interstate. In a conventional "circuit-switched network," the jurisdictional analysis is straightforward: a call is intrastate if, and only if, it originates and terminates in the same state. In a "packet-switched network," the analysis is not so simple, as "[a]n Internet communication does not necessarily have a point of 'termination' in the traditional sense." FCC Ruling, 14 FCC Rcd at 3701–02 (¶ 18). In a single session an end user may communicate with multiple destination points, either sequentially or simultaneously. Although these destinations are sometimes intrastate, the Commission concluded that "a substantial portion of Internet traffic involves accessing interstate or foreign websites." *Id.* Thus reciprocal compensation was not due, and the issue of compensation between the two local LECs was left initially to the LECs involved, subject to state commissions' power to order compensation in the "arbitration" proceedings, and, of course to whatever may follow from the Commission's new rulemaking on its own possible ratesetting.

\* \* \*

The issue at the heart of this case is whether a call to an ISP is local or long-distance. Neither category fits clearly. The Commission has described local calls, on the one hand, as those in which LECs collaborate to complete a call and are compensated for their respective roles in completing the call, and long-distance calls, on the other, as those in which the LECs collaborate with a long-distance carrier, which itself charges the end-user and pays out compensation to the LECs. See *Local Competition Order*, 11 FCC Rcd at 16013 (¶ 1034) (1996).

Calls to ISPs are not quite local, because there is some communication taking place between the ISP and out-of-state websites. But they are not quite long-distance, because the subsequent communication is not really a continuation, in the conventional sense, of the initial call to the ISP. The Commission's ruling rests squarely on its decision to employ an end-to-end analysis for purposes of determining whether ISP-traffic is local. There is no dispute that the Commission has historically been justified in relying on this method when determining whether a particular communication is jurisdictionally interstate. But it has yet to provide an explanation why this inquiry is relevant to discerning whether a call to an ISP should fit within the local call model of two collaborating LECs or the long-distance model of a long-distance carrier collaborating with two LECs.

1. "Telephone exchange service" is defined as: (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service. 47 U.S.C. § 153(47). "Exchange access" is defined as: the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services. *Id.* § 153(16).

In fact, the extension of "end-to-end" analysis from jurisdictional purposes to the present context yields intuitively backwards results. Calls that are jurisdictionally *intra*state will be subject to the federal reciprocal compensation requirement, while calls that are *inter*state are not subject to federal regulation but instead are left to potential state regulation. The inconsistency is not necessarily fatal, since under the 1996 Act the Commission has jurisdiction to implement such provisions as § 251, even if they are within the traditional domain of the states. See *AT&T Corp.*, 119 S.Ct. at 730. But it reveals that arguments supporting use of the end-to-end analysis in the jurisdictional analysis are not obviously transferable to this context.

In attacking the Commission's classification of ISP-bound calls as non-local for purposes of reciprocal compensation, MCI WorldCom notes that under 47 CFR § 51.701(b)(1) "telecommunications traffic" is local if it "originates and terminates within a local service area." But, observes MCI WorldCom, the Commission failed to apply, or even to mention, its definition of "termination," namely "the switching of traffic that is subject to section 251(b)(5) at the terminating carrier's end office switch (or equivalent facility) and delivery of that traffic from that switch to the called party's premises." *Local Competition Order*, 11 FCC Rcd at 16015 (¶ 1040); 47 CFR § 51.701(d). Calls to ISPs appear to fit this definition: the traffic is switched by the LEC whose customer is the ISP and then delivered to the ISP, which is clearly the "called party."

In its ruling the Commission avoided this result by analyzing the communication on an end-to-end basis: "[T]he communications at issue here do not terminate at the ISP's local server ..., but continue to the ultimate destination or destinations." FCC Ruling, 14 FCC Rcd at 3697 (¶ 12). But the cases it relied on for using this analysis are not on point. Both involved a single continuous communication, originat-ed by an end-user, switched by a long-distance communications carrier, and eventually delivered to its destination. One, *Teleconnect Co. v. Bell Telephone Co.*, 10 FCC Rcd 1626 (1995), *aff'd sub nom. Southwestern Bell Tel. Co. v. FCC*, 116 F.3d 593 (D.C.Cir.1997) ("*Teleconnect*"), involved an 800 call to a long-distance carrier, which then routed the call to its intended recipient. The other, *In the Matter of Petition for Emergency Relief and Declaratory Ruling Filed by the BellSouth Corporation*, 7 FCC Rcd 1619 (1992), considered a voice mail service. Part of the service, the forwarding of the call from the intended recipient's location to the voice mail apparatus and service, occurred entirely within the subscriber's state, and thus looked local. Looking "end-to-end," however, the Commission refused to focus on this portion of the call but rather considered the service in its entirety (i.e., originating with the out-of-state caller leaving a message, or the subscriber calling from out-of-state to retrieve messages). *Id.* at 1621 (¶ 12).

ISPs, in contrast, are "information service providers," *Universal Service Report*, 13 FCC Rcd at 11532–33 (¶ 66), which upon receiving a call originate further communications to deliver and retrieve information to and from distant websites. The Commission acknowledged in a footnote that the cases it relied upon were distinguishable, but dismissed the problem out-of-hand: "Although the cited cases involve interexchange carriers rather than ISPs, and the Commission has observed that 'it is not clear that [information service providers] use the public switched network in a manner analogous to IXCs,' *Access Charge Reform Order*, 12 FCC Rcd at 16133, the Commission's observation does not affect the jurisdictional analysis." FCC Ruling, 14 FCC Rcd at 3697 n.36 (¶ 12). It is not clear how this helps the Commission. Even if the difference between ISPs and traditional long-distance carriers is irrelevant for jurisdictional purposes, it appears relevant for

purposes of reciprocal compensation. Although ISPs use telecommunications to provide information service, they are not themselves telecommunications providers (as are long-distance carriers).

In this regard an ISP appears, as MCI WorldCom argued, no different from many businesses, such as "pizza delivery firms, travel reservation agencies, credit card verification firms, or taxicab companies," which use a variety of communication services to provide their goods or services to their customers. Comments of WorldCom, Inc. at 7 (July 17, 1997). Of course, the ISP's origination of telecommunications as a result of the user's call is instantaneous (although perhaps no more so than a credit card verification system or a bank account information service). But this does not imply that the original communication does not "terminate" at the ISP. The Commission has not satisfactorily explained why an ISP is not, for purposes of reciprocal compensation, "simply a communications-intensive business end user selling a product to other consumer and business end-users." *Id.*

The Commission nevertheless argues that although the call from the ISP to an out-of-state website is information service for the end-user, it is telecommunications for the ISP, and thus the telecommunications cannot be said to "terminate" at the ISP. As the Commission states: "Even if, from the perspective of the *end user* as customer, the telecommunications portion of an Internet call 'terminates' at the ISP's server (and information service begins), the remaining portion of the call would continue to constitute telecommunications from the perspective of the *ISP* as customer." Commission's Br. at 41. Once again, however, the mere fact that the ISP originates further telecommunications does not imply that the original telecommunication does not "terminate" at the ISP. However

sound the end-to-end analysis may be for jurisdictional purposes, the Commission has not explained why viewing these linked telecommunications as continuous works for purposes of reciprocal compensation.

Adding further confusion is a series of Commission rulings dealing with a class, enhanced service providers ("ESPs"), of which ISPs are a subclass. See FCC Ruling, 14 FCC Rcd at 3689 n.1 (¶ 1). ESPs, the precursors to the 1996 Act's information service providers, offer data processing services, linking customers and computers via the telephone network. See *MCI Telecommunications Corp. v. FCC*, 57 F.3d 1136, 1138 (D.C.Cir.1995).[2] In its establishment of the access charge system for long-distance calls, the Commission in 1983 exempted ESPs from the access charge system, thus in effect treating them like end users rather than long-distance carriers. See *In the Matter of MTS & WATS Market Structure*, 97 F.C.C.2d 682, 711–15 (¶ 77–83), 1983 WL 183026 (1983). It reaffirmed this decision in 1991, explaining that it had "refrained from applying full access charges to ESPs out of concern that the industry has continued to be affected by a number of significant, potentially disruptive, and rapidly changing circumstances." *In the Matter of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture*, 6 FCC Rcd 4524, 4534 (¶ 54) (1991). In 1997 it again preserved the status quo. *In the Matter of Access Charge Reform*, 12 FCC Rcd 15982 (1997) ("*Access Charge Reform Order*"). It justified the exemption in terms of the goals of the 1996 Act, saying that its purpose was to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." *Id.* at 16133 (¶ 344) (quoting 47 U.S.C. § 230(b)(2)).

---

**2.** The regulatory definition states that ESPs offer "services ... which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information." 47 CFR § 64.702(a).

This classification of ESPs is something of an embarrassment to the Commission's present ruling. As MCI WorldCom notes, the Commission acknowledged in the *Access Charge Reform Order* that "given the evolution in [information service provider] technologies and markets since we first established access charges in the early 1980s, it is not clear that [information service providers] use the public switched network in a manner analogous to IXCs [inter-exchange carriers]." 12 FCC Rcd at 16133 (¶ 345). It also referred to calls to information service providers as "local." *Id.* at 16132 (¶ 342 n.502). And when this aspect of the *Access Charge Reform Order* was challenged in the 8th Circuit, the Commission's briefwriters responded with a sharp differentiation between such calls and ordinary long-distance calls covered by the "end-to-end" analysis, and even used the analogy employed by MCI WorldCom here—that a call to an information service provider is really like a call to a local business that then uses the telephone to order wares to meet the need. Brief of FCC at 76, *Southwestern Bell v. FCC,* 153 F.3d 523 (8th Cir.1998) (No. 97–2618). When accused of inconsistency in the present matter, the Commission flipped the argument on its head, arguing that its exemption of ESPs from access charges actually confirms "its understanding that ESPs in fact use interstate access service; otherwise, the exemption would not be necessary." FCC Ruling, 14 FCC Rcd at 3700 (¶ 16). This is not very compelling. Although, to be sure, the Commission used policy arguments to justify the "exemption," it also rested it on an acknowledgment of the real differences between long-distance calls and calls to information service providers. It is obscure why those have now dropped out of the picture.

Because the Commission has not supplied a real explanation for its decision to treat end-to-end analysis as controlling, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); 5 U.S.C. § 706(2)(A), we must vacate the ruling and remand the case.

■ There is an independent ground requiring remand—the fit of the present rule within the governing statute. MCI WorldCom says that ISP-traffic is "telephone exchange service[ ]" as defined in 47 U.S.C. § 153(16), which it claims "is synonymous under the Act with the service used to make local phone calls," and emphatically not "exchange access" as defined in 47 U.S.C. § 153(47). Petitioner MCI WorldCom's Initial Br. at 22. In the only paragraph of the ruling in which the Commission addressed this issue, it merely stated that it "consistently has characterized ESPs as 'users of access service' but has treated them as end users for pricing purposes." FCC Ruling, 14 FCC Rcd at 3701 (¶ 17). In a statutory world of "telephone exchange *service*" and "exchange *access,*" which the Commission here says constitute the only possibilities, the reference to "access service," combining the different key words from the two terms before us, sheds no light. "Access service" is in fact a pre-Act term, defined as "services and facilities provided for the origination or termination of any interstate or foreign telecommunication." 47 CFR § 69.2(b).

If the Commission meant to place ISP-traffic within a third category, not "telephone exchange service" and not "exchange access," that would conflict with its concession on appeal that "exchange access" and "telephone exchange service" occupy the field. But if it meant that just as ESPs were "users of access service" but treated as end users for pricing purposes, so too ISPs are users of exchange access, the Commission has not provided a satisfactory explanation why this is the case. In fact, in *In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended,* 11 FCC Rcd 21905, 22023 (¶ 248) (1996), the Commission clearly stated that "ISPs do not use exchange access." After oral argument in this case the Commission over-

ruled this determination, saying that "non-carriers may be purchasers of those services." *In the Matter of Deployment of Wireline Services Offering Advanced Telecommunications Capability,* FCC 99–413, at 21 (¶ 43) (Dec. 23, 1999). The Commission relied on its preAct orders in which it had determined that non-carriers can use "access services," and concluded that there is no evidence that Congress, in codifying "exchange access," intended to depart from this understanding. See *id.* at 21–22 (¶ 44). The Commission, however, did not make this argument in the ruling under review.

Nor did the Commission even consider how regarding noncarriers as purchasers of "exchange access" fits with the statutory definition of that term. A call is "exchange access" if offered "for the purpose of the origination or termination of *telephone toll services.*" 47 U.S.C. § 153(16). As MCI WorldCom argued, ISPs provide information service rather than telecommunications; as such, "ISPs connect to the local network 'for the purpose of' providing information services, not originating or terminating telephone toll services." Petitioner MCI WorldCom's Reply Br. at 6.

■ The statute appears ambiguous as to whether calls to ISPs fit within "exchange access" or "telephone exchange service," and on that view any agency interpretation would be subject to judicial deference. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But, even though we review the agency's interpretation only for reasonableness where Congress has not resolved the issue, where a decision "is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service." *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). See also *Acme Die Casting v. NLRB,* 26 F.3d 162, 166 (D.C.Cir.1994); *Leeco, Inc. v. Hays,* 965 F.2d 1081, 1085 (D.C.Cir.1992);

*City of Kansas City v. Department of Housing and Urban Development,* 923 F.2d 188, 191–92 (D.C.Cir.1991).

&ast; &ast; &ast;

Because the Commission has not provided a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as "terminat[ing] . . . local telecommunications traffic," and why such traffic is "exchange access" rather than "telephone exchange service," we vacate the ruling and remand the case to the Commission. We do not reach the objections of the incumbent LECs—that § 251(b)(5) preempts state commission authority to compel payments to the competitor LECs; at present we have no adequately explained classification of these communications, and in the interim our vacatur of the Commission's ruling leaves the incumbents free to seek relief from state-authorized compensation that they believe to be wrongfully imposed.

*So ordered.*