Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued May 12, 2003           Decided July 18, 2003

No. 02-1131

STARPOWER COMMUNICATIONS, LLC
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

VERIZON VIRGINIA INC.,
INTERVENOR

————

On Petition for Review of an Order of the
Federal Communications Commission

————

*Russell M. Blau* argued the cause and filed the briefs for petitioner.

*William Single IV, Donald B. Verrilli, Jr.,* and *John J. Hamill* were on the brief for *amicus curiae* WorldCom, Inc. in support of petitioner.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard K. Welch*, Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *John A. Rogovin*, General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Lisa E. Boehley*, Counsel. *Daniel M. Armstrong*, Associate General Counsel, *Catherine G. O'Sullivan*, Chief Counsel, U.S. Department of Justice, and *Nancy C. Garrison*, Attorney, entered appearances.

*Aaron M. Panner* argued the cause for intervenor Verizon Virginia Inc. With him on the brief were *Michael E. Glover*, *Edward H. Shakin* and *John M. Goodman*.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Starpower Communications LLC petitions for review of an order of the Federal Communications Commission holding that two interconnection agreements between Starpower and Verizon Virginia Inc. (Verizon) unambiguously do not require reciprocal compensation for telephone traffic bound for an internet service provider (ISP). We hold that, under Virginia's plain meaning rule, the agreements are not unambiguous in that respect. Accordingly, we grant Starpower's petition and remand the order to the Commission for further proceedings.

## I. Background

Starpower is a competitive local exchange carrier (CLEC) operating in Virginia, where Verizon is the incumbent local exchange carrier (ILEC). Verizon is obliged by federal law to provide Starpower with interconnection to its local network in order to enable an end user subscribing to Starpower's local exchange service to place calls to, and to receive calls from, end users subscribing to Verizon's local exchange service. *See* 47 U.S.C. § 251(b)-(c). Starpower may either negotiate its own interconnection agreement with Verizon or simply adopt an agreement Verizon has made with another CLEC. *See id.* § 252(i) (requiring an ILEC to "make available any interconnection, service, or network element provid-

ed under an agreement" to "any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement"). As part of such an agreement, Verizon and Starpower must "establish reciprocal compensation arrangements [that is, pay for the use of each other's facilities] for the transport and termination of telecommunications." *Id.* § 251(b)(5).

The relevant state regulatory commission–in this case, the Virginia State Corporation Commission (VSCC)–has primary authority to approve an interconnection agreement and to arbitrate any dispute arising therefrom. *See* 47 U.S.C. § 252(b)-(e). If the state commission fails to carry out this responsibility, then the Federal Communications Commission "shall issue an order preempting the State commission's jurisdiction of that proceeding or matter . . . and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission." *Id.* § 252(e)(5).

A. The Interconnection Agreements

1. The 1998 Agreement

In February 1998 Starpower elected, pursuant to 47 U.S.C. § 252(i), to obtain interconnection, services, and network elements upon the same terms and conditions as those contained in an agreement between Verizon and MFS Intelnet of Virginia, Inc., which the VSCC had approved in 1996. The VSCC approved the agreement between Starpower and Verizon in June 1998.

Section 5.7 of the 1998 Agreement explains the duties of the parties with respect to reciprocal compensation:

> 5.7.2 The Parties shall compensate each other for transport and termination of Local Traffic in an equal and symmetrical manner at the rates provided in the Detailed Schedule of Itemized Charges. . . .

> 5.7.3 The Reciprocal Compensation arrangements set forth in this Agreement are not applicable to Switched Exchange Access Service. All Switched Exchange Access Service and all Toll Traffic shall continue to be

governed by the terms and conditions of the applicable federal and state Tariffs.

. . .

5.7.5 The designation of Traffic as Local or Toll for purposes of compensation shall be based on the actual originating and terminating points of the complete end-to-end call regardless of the carrier(s) involved in carrying any segment of the call.

Section 1.61 of the agreement provides that "Reciprocal Compensation" means:

"Reciprocal Compensation" . . . As Described in [or required by the Communications Act of 1934, as amended by the Telecommunications Act of 1996 "and as from time to time interpreted in the duly authorized rules and regulations of the FCC," *see* § 1.7], and refers to the payment arrangements that recover costs incurred for the transport and termination of Local Traffic originating on one Party's network and terminating on the other Party's network.

Finally, under § 1.44 of the agreement, "Local Traffic"

means traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network, within a given local calling area, or expanded area service ("EAS") area, as defined in [Verizon]'s effective customer tariffs. Local Traffic does not include traffic originated or terminated by a commercial mobile radio [that is, cellular telephone] service carrier.

The parties began exchanging traffic in June 1998 and shortly thereafter Starpower billed Verizon for, among other things, calls originating on Verizon's network and terminating with ISPs on Starpower's network. Verizon, maintaining that the agreement did not cover ISP-bound traffic, refused to pay. In April 1999 Verizon notified Starpower that it was terminating the agreement.

2. The 1999 Agreement

In June 1999 Starpower notified Verizon that it intended to adopt the terms of an agreement Verizon had made with MCImetro Access Transmission Services of Virginia, Inc. in July 1997. The 1999 Agreement between Starpower and Verizon, which the VSCC approved in April 2000, contains the following provisions relevant to this dispute over reciprocal compensation:

> 4.1 [Starpower] may choose to deliver both Local Traffic and toll traffic over the same trunk group(s).... In the event [Starpower] chooses to deliver both types of traffic over the same traffic exchange trunks, and desires application of the local call transport and termination rates, it will provide Percent Local Usage ("PLU") information to [Verizon].... In the event [Starpower] includes both interstate and intrastate toll traffic over the same trunk, it will provide Percent Interstate Usage ("PIU") to [Verizon ... , which] shall have the same options, and to the extent it avails itself of them, the same obligation, to provide PIU and PLU information to [Starpower]. *To the extent feasible, PLU and PIU information shall be based on the actual end-to-end jurisdictional nature of each call sent over the trunk....* [Emphasis supplied.]
>
> 4.2 Reciprocal Compensation for the exchange of Local Traffic is set forth in Table 1 of this Attachment and shall be assessed on a per minute-of-use basis for the transport and termination of such traffic.

"Reciprocal Compensation" is defined in Part B as

> a reciprocal compensation arrangement between two carriers in which each of the two carriers receives compensation from the other carrier for the transport and termination on each carrier's network facilities of Local Traffic that originates on the network facilities of the other carrier.

The definition of "Local Traffic" in Part B closely resembles its counterpart in the 1998 Agreement:

> "Local Traffic" means traffic that is originated by an end user subscriber of one Party on that Party's network and terminates to an end user subscriber of the other Party on that other Party's network within a given local calling area, or expanded area service ("EAS") area, as defined in [Verizon]'s Tariffs, or, if the Commission has defined local calling areas applicable to all Local Exchange Carriers, then as so defined by the Commission.

Starpower and Verizon exchanged traffic pursuant to the terms of the 1999 Agreement and once again Verizon refused to pay Starpower for ISP-bound traffic.

B.  Administrative Proceedings

In 1999 Starpower filed petitions with the VSCC seeking declarations requiring Verizon to pay for ISP-bound traffic under the two agreements. The VSCC declined jurisdiction in favor of the Commission. *See* 47 U.S.C. § 252(e)(5). Starpower then petitioned the Commission to preempt the jurisdiction of the VSCC and, when the Commission did so, Starpower filed a complaint with the Commission charging that Verizon had violated the agreements by failing to pay reciprocal compensation for ISP-bound traffic.

Because it stood in the shoes of the VSCC, the Commission was obliged to apply the contract law of Virginia, including the rule that "where the terms of the contract are clear and unambiguous, we will construe those terms according to their plain meaning." *Starpower Communications, LLC v. Verizon Virginia, Inc.*, 17 FCC Rcd. 6873 ¶ 24 (2002) ("*Order*") (citing *American Spirit Ins. Co. v. Owens*, 261 Va. 270, 275, 541 S.E.2d 553, 555 (2001)). The Commission held the agreements unambiguously did not require reciprocal compensation for ISP-bound traffic for two reasons. *Id.* ¶ 50.

First, the Commission interpreted the term "end-to-end" in § 5.7.5 of the 1998 Agreement and in § 4.1 of the 1999 Agreement, which term "had achieved a customary meaning in the telecommunications industry," *id.* ¶ 28, as "an incorporation of the Commission's long-standing method of determining the *jurisdictional* nature of particular traffic," *id.* ¶ 27

(emphasis in original). The Commission had consistently held that ISP-bound traffic was "predominantly interstate for jurisdictional purposes," *id.* ¶ 30, and therefore not subject to reciprocal compensation.

Second, because "the agreements' definitions of 'Local Traffic' closely resemble the Commission's preexisting descriptions of the kind of traffic subject to the reciprocal compensation mandate of section 251(b)(5)," the Commission inferred the parties "inten[ded] to track the Commission's interpretation of the scope of section 251(b)(5)," *id.* ¶ 31, and "the Commission consistently has concluded that ISP-bound traffic does not fall within the scope of traffic compensable under section 251(b)(5)." *Id.* ¶ 31. Therefore, the Commission concluded that the parties could not have intended to include ISP-bound traffic in the definition of "Local Traffic."

The Commission then rejected Starpower's argument that the purpose, structure, and substance of the agreements showed the parties intended ISP-bound traffic to be treated as "Local Traffic." The Commission determined that certain state regulatory decisions, *see e.g.*, *Complaint of MFS Intelnet of Md., Inc. against Bell Atlantic–Maryland, Inc. for Breach of Interconnection Terms and Request for Immediate Relief*, Case No. 8731, Order (Md. P.U.C. June 11, 1999); *Petition for Declaratory Order of TCG Delaware Valley, Inc. for Clarification of Section 5.7.2 of Its Interconnection Agreement with Bell–Atlantic Pennsylvania, Inc.*, Case No. P–00971256, Opinion and Order (Pa. P.U.C. June 16, 1998), including a decision of the VSCC, *Petition of Cox Virginia Telecom, Inc.*, Case No. PUC970069, Final Order (1997), all holding that similar interconnection agreements required reciprocal compensation for ISP-bound traffic, were not dispositive because "none of these decisions specifically construes the contractual language at issue in this case." The Commission concluded that the 1998 and 1999 Agreements clearly and unambiguously did not require reciprocal compensation for ISP-bound traffic.

Commissioner Martin dissented in part, *Order*, 17 FCC Rcd. at 6895, on the ground that the end-to-end analysis used

by the Commission had been drawn into question by this court in *Bell Atlantic Telephone Companies v. FCC*, 206 F.3d 1 (D.C. Cir. 2000). In that case we held the Commission had not adequately explained its reasoning in determining that LECs did not have to pay reciprocal compensation for ISP-bound traffic under § 251(b)(5). *Id.* at 5.

## II. Analysis

Starpower argues that (1) both the plain meaning and the context of the agreements clearly indicate that reciprocal compensation is required for ISP-bound traffic; or (2) at the very least, the agreements are ambiguous on that score. The Commission and intervenor Verizon argue that the agency correctly interpreted the agreements pursuant to Virginia law. We agree with Starpower's alternative argument that under Virginia law the agreements do not unambiguously resolve the question of reciprocal compensation for ISP-bound traffic.

### A. Standard of Review

Initially the parties dispute the standard of review we are to use. Starpower argues our review should be *de novo* because the Commission, standing in the shoes of the VSCC, applied principles of Virginia contract law, as to which it has no particular expertise. *See Cellwave Tel. Servs. L.P. v. FCC*, 30 F.3d 1533, 1537 (D.C. Cir. 1994). The Commission responds that its decision merits our deference because it interpreted terms commonly used in the telecommunications industry, as to which it does have expertise. We need not decide this collateral dispute, however, because the contracts are so far from clearly unambiguous that we would resolve this issue in the same manner regardless whether we owe the Commission any deference.

### B. Interpretation of the Agreements

The ambiguity in the agreements arises from the hybrid nature of a call to an ISP and the failure of the parties expressly to state whether ISP-bound traffic should be treated as local or non-local. When an end user's modem dials up

an ISP, it is not for the purpose of communicating with the ISP. The ISP is merely a gateway through which to connect with a website, which could be located anywhere. A call to an ISP, therefore, has both local and non-local characteristics. *See Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000). Indeed, the Commission regulates ISP-bound traffic as local for some purposes and as non-local for other purposes. *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter–Carrier Compensation for ISP–Bound Traffic*, Order on Remand and Report and Order, 16 FCC Rcd. 9151, ¶ 45 (2001) (stating ISPs may purchase access using local business tariffs although jurisdictionally ISP-bound traffic is considered interstate). Nothing in the present agreements unambiguously elevates one aspect of ISP-bound traffic over the other.

The Commission makes two principal arguments in defense of its interpretation of the agreements: First, the agreements clearly invoke the non-local end-to-end jurisdictional nature of ISP-bound traffic. Second, the definition of "Local Traffic" in each agreement tracks the Commission's interpretation of § 251(b)(5), *see* 47 C.F.R. § 51.701(b)(1) (1997), which does not require compensation for ISP-bound traffic. For its part, Starpower argues that the context in which the term "end-to-end" was used in each agreement – designating a call as "Local" versus "Toll" in the 1998 Agreement, and providing data on local versus interstate trunk usage in the 1999 Agreement – shows that the parties did not invoke an end-to-end jurisdictional analysis for the purpose of reciprocal compensation; the definition of "Local Traffic" in the respective agreements has a meaning independent of the Commission's interpretation of the statute; and the Commission's interpretation of § 251(b)(5) to exclude ISP-bound traffic from reciprocal compensation has been twice rejected by this court. *See Bell Atlantic*, 206 F.3d 1; *WorldCom, Inc. v. FCC*, 288 F.3d 429 (2002). Intervenor WorldCom adds that the term "end-to-end" was used to "ensure[ ] that calls were properly classified depending on the location and telephone numbers of

the parties to the call, not the path that a call might take."*

We will assume, for purposes of this case, the Commission is correct that an ISP-bound call is jurisdictionally interstate. We have previously endorsed the Commission's end-to-end analysis for determining whether traffic is within federal or state jurisdiction. *See Bell Atlantic*, 206 F.3d at 5. We agree nevertheless with Starpower that the 1998 and 1999 Agreements do not unambiguously incorporate the Commission's end-to-end analysis.

Section 5.7.5 of the 1998 Agreement uses the term "end-to-end" to modify "call"; the agreement does not explain the meaning of the phrase "end-to-end call," and nowhere does it use the word "jurisdiction." The Commission focused exclusively upon the term "end-to-end" in § 5.7.5, to the exclusion of other terms in the same sentence (such as "terminating points") that pointed to an alternative interpretation under which reciprocal compensation would be due for ISP-bound traffic. Indeed, the VSCC, in construing the identical agreement, held that it required reciprocal compensation for ISP-bound traffic. *See Cox Virginia Telecom, Inc.*, Case No. PUC970069, Final Order at 2. Although the decision of the VSCC is short on analysis, it suggests at least that reasonable minds can disagree about the meaning of the 1998 Agreement. Further in that vein, we note that WorldCom's explanation of the term "end-to-end," which focuses upon the phone number involved in the call, also offers a plausible alternative to the Commission's interpretation of § 5.7.5.

Neither does the use of "end-to-end" in § 4.1 of the 1999 Agreement unambiguously exclude ISP-traffic from reciprocal compensation. Although that agreement refers to the "end-to-end jurisdictional nature of each call," it does so only in § 4.1, which deals with the manner in which the parties are to gather data about trunk usage, not in the section (4.2) of

_____

* The Commission and intervenor Verizon contend that any argument concerning the meaning of the term "end-to-end" was not raised by Starpower below and is accordingly forfeit, 47 U.S.C. § 405. In fact, however, Starpower raised this issue in its Supplemental Reply Brief before the Commission.

the agreement dealing with reciprocal compensation. Although one may argue that "end-to-end" in § 4.1 informs the interpretation of reciprocal compensation in § 4.2, it does not follow apodictically that the 1999 Agreement incorporates the Commission's end-to-end jurisdictional analysis for the purpose of requiring reciprocal compensation.

The Commission's second argument is that the definition of "Local Traffic" in each agreement invokes the Commission's interpretation of § 251(b)(5), under which ISP-bound traffic is not subject to compensation. Intervenor Verizon adds that the definition of "Reciprocal Compensation" in the 1998 Agreement specifically incorporates federal law "as described in the [Communications Act of 1934, as amended by the Telecommunications Act of 1996]."

Starpower responds that the parties' having defined "local traffic" in their agreements by using terms similar to those the Commission used in interpreting a related statute "does not imply that the parties intended to allow the FCC to define this concept for them." Here the petitioner notes that several state commissions have interpreted the terms "local traffic" and "terminates" in an interconnection agreement to require reciprocal compensation for ISP-bound traffic, with the approval of the federal courts of appeals. *See, e.g., Southwestern Bell Tel. Co. v. Public Utility Comm'n of Texas*, 208 F.3d 475, 485–88 (5th Cir. 2000); *Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Oklahoma, Inc.*, 235 F.3d 493, 499 (10th Cir. 2000) ("The [Oklahoma Corporation Commission] reasoned that because the FCC treats ISPs as end-users, the point of termination of calls to ISPs is the location of the ISP. Moreover, where the calling party and the called party, in this case the ISP, are located in the same local calling area, the call is 'local traffic' under the express terms of the Agreement. . . . We believe the OCC reasonably interpreted the Agreement to mean that calls to ISPs are 'terminating traffic' subject to reciprocal compensation"); *Illinois Bell Tel. Co. v. WorldCom Technologies, Inc.*, 179 F.3d 566, 573–74 (7th Cir. 1999) (upholding determination of Illinois Commerce Commission that calls to ISPs can, by contract, be

treated as local traffic subject to reciprocal compensation under the terms of an interconnection agreement).

We agree with Starpower that the definitions of "Local Traffic" in the 1998 and 1999 Agreements do not unambiguously incorporate the Commission's interpretation of § 251(b)(5). If the parties wanted to use the same definition of "local traffic" as does the Commission, then they could have simply said so, but they did not do so in either agreement. In addition, Starpower advances a plausible interpretation of the terms "local traffic" and "terminate," as they appear in the two agreements: Simply put, a call to an ISP "terminates" at the ISP and therefore qualifies for reciprocal compensation. Consider what the Fifth Circuit said in affirming the determination of the Texas Public Utilities Commission that calls made to an ISP are subject to reciprocal compensation:

> As for the modem calls here at issue, the ISPs are [the CLEC's] customers, making [the CLEC] the terminating carrier. So, under the [Commission's] definition, "termination" occurs when [the CLEC] switches the call at its facility and delivers the call to "the called party's premises," which is the ISP's local facility. Under this usage, the call indeed "terminates" at the ISP's premises.

*Southwestern Bell*, 208 F.3d at 486. In sum, the 1998 and 1999 Agreements could certainly support a reading that a call to an ISP terminates at the ISP and is therefore compensable.

Nor does Verizon's separate argument concerning the definition of "Reciprocal Compensation" in the 1998 Agreement establish that the agreement unambiguously excludes ISP-bound calls from reciprocal compensation. As Verizon points out, the first clause of the definition of "Reciprocal Compensation" in § 1.61 of the 1998 Agreement, insofar as it refers to the Act "as from time to time interpreted" by the Commission in "rules and regulations," implies the parties intended automatically to follow the Commission's interpretation of § 251(b)(5). That phrase may not be viewed in isolation, however. The second clause of the same definition provides

that reciprocal compensation "refers to the payment arrangements that recover costs incurred for the transport and termination of Local Traffic originating on one Party's network and terminating on the other Party's network." This clause uses terms – such as "termination" and "Local Traffic" – that, as shown above, could be read to mean that the carriers are required to pay reciprocal compensation for ISP-bound traffic.

In sum, the 1998 and 1999 agreements are models of ambiguity with respect to reciprocal compensation for ISP-bound traffic. Certain terms, such as "local traffic" and "terminate," could readily support an interpretation that would require Verizon and Starpower to compensate each other for ISP-bound traffic. At the same time, the term "end-to-end" in § 5.7.5 of the 1998 Agreement and in §§ 4.1 and 4.2 of the 1999 Agreement implies that the Commission's jurisdictional end-to-end analysis controls, so that reciprocal compensation is not due. Thus, the agreements are susceptible to two meanings, and the Commission erred in holding the agreements unambiguously exclude ISP-bound traffic.

### III. Conclusion

For the foregoing reasons, we grant the petition for review and remand the *Order* to the Commission for further proceedings not inconsistent with this opinion.

*So ordered.*