BYE, Circuit Judge,
dissenting.
Because the Arkansas Public Service Commission (APSC) did not determine the existence of a latent ambiguity in the Interconnection Agreement at issue, I do not believe its decision is entitled to any deference under an arbitrary-and-capricious standard of review. Further, I cannot detect a latent ambiguity in the Interconnection Agreement, and therefore do not believe the APSC’s decision can stand even under the more deferential arbitrary-and-capricious standard. For those reasons, I would reverse the district court’s judgment, and respectfully dissent.
The Court states: “The APSC did not clarify whether it found the ambiguity to be patent or latent, though it appears from its reasoning that it found it to be a latent ambiguity.” Ante at 708 n. 4. I cannot draw the same conclusion as to the APSC’s reasoning. Rather, it seems clear the notion of a latent ambiguity was only interjected into this case by the district court as an after-the-fact attempt to justify the APSC’s flawed and conclusory reasoning finding an ambiguity in the Interconnection Agreement.
The following is the sum and substance of the APSC’s reasoning to support its determination the Interconnection Agreement was ambiguous:
Although both Connect and SWBT argue that there is no ambiguity in their Interconnection Agreement, the parties interpret the contract to reach diametrically opposed results. This fact, coupled with a comparison of the Interconnection Agreement at issue in this docket and the contracts reviewed in Starpower v. FCC, [334 F.3d 1150 (D.C.Cir.2003),] together with the D.C. Circuit’s holding that the contracts in that case were *714 clearly ambiguous, support the conclusion that the ConnectSWBT Interconnection Agreement at issue is ambiguous.
Appellant’s Add. at 23-24.
Thus, the APSC gave two “reasons” for its decision. The first was the agreement must be ambiguous simply because “the parties interpret the contract to reach diametrically opposed results.” This reasoning is obviously arbitrary and capricious. Such a rule would mean ambiguity turns on the parties’ arguments rather than a contract’s terms, thereby rendering every disputed contract ambiguous. This makes no sense.
Second, the APSC relied upon the D.C. Circuit’s interpretation of an interconnection agreement in Starpower Commc’ns, LLC v. FCC, 334 F.3d 1150 (D.C.Cir.2003). A mere cursory examination of Starpower reveals the arbitrary and capricious nature of the APSC’s reasoning. In Starpower, the FCC issued an order indicating interconnection agreements between Starpower and Verizon Virginia, Inc., were unambiguous, and thus Verizon did not have to pay Starpower for ISP-bound traffic as local traffic under the agreement. Focusing on the agreement’s use of the phrase “end-to-end,” the D.C. Circuit disagreed, concluding the parties’ agreements were
models of ambiguity with respect to reciprocal compensation for ISPbound traffic. Certain terms, such as “local traffic” and “terminate,” could readily support an interpretation that would require Verizon and Starpower to compensate each other for ISP-bound traffic. At the same time, the term “end-to-end” in § 5.7.5 of the 1998 Agreement and in §§ 4.1 and 4.2 of the 1999 agreement implies that the Commission’s jurisdictional end-to-end analysis controls, so that reciprocal compensation is not due. Thus, the agreements are susceptible to two meanings, and the Commission erred in holding the agreements unambiguously exclude ISP-bound traffic.
Starpower, 334 F.3d at 1157.
The D.C. Circuit focused exclusively upon the agreement’s use of the term “end-to-end” as the language which created an ambiguity. Starpower has absolutely no bearing on the interconnection agreement at issue in this case, because nowhere does this agreement use the term “end-to-end,” or anywhere else incorporate the FCC’s jurisdictional end-to-end analysis for determining the interstate or local nature of a given call.
Because both “reasons” given by the APSC for finding an ambiguity in the agreement are fundamentally flawed, I see no reason to pay its decision any deference whatsoever.
Reviewing the APSC’s decision de novo, as I believe we should, see Qwest Corp. v. Minn. Pub. Utils. Comm’n, 427 F.3d 1061, 1064 (8th Cir.2005) (reviewing de novo whether a state agency acts within its authority in implementing the Telecommunications Act of 1996); see also Western World Ins. Co. v. Branch, 332 Ark. 427, 965 S.W.2d 760, 761 (1998) (indicating the question whether a contract is ambiguous is a question of law), I can find no ambiguity in the interconnection agreement between Southwestern Bell (SWB) and Connect Communications.
Under Arkansas law, the language contained in the contract is the best evidence of the parties’ intention. First Nat’l Bank v. Griffin, 310 Ark. 164, 832 S.W.2d 816, 818-19 (1992). “When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court’s duty to construe the writing in accordance with the plain meaning of the language employed.” Surratt v. *715 Surratt, 85 Ark.App. 267, 148 S.W.3d 761, 768 (2004).
Under the plain and unambiguous language of the agreement, calls placed from SWB’s customers to internet service providers (ISPs) within the same SWB exchange were defined as local calls for which SWB agreed to pay Connect reciprocal compensation. The contract language defines traffic as terminating when it is “delivered.” See Add. at 57 (defining “Terminating Traffic” as a “telecommunications service which is delivered to an end user(s) as a result of another end user’s attempt to establish communication between the parties.”). It is undisputed the calls at issue were delivered, and therefore terminated, to Connect end users (ISPs) at a geographical location within the same local exchange area. SWB clearly agreed to compensate Connect for such calls. See Add. at 49 (“SWBT agrees to compensate CONNECT for the termination of SWBT Local Traffic originated by SWBT end users in the SWBT exchanges described in Appendix DCO and terminating to CONNECT end users.”).
“A latent ambiguity arises [only] when the contract on its face appears clear and unambiguous, but collateral facts exist that make the contract’s meaning uncertain.” Oliver v. Oliver, 70 Ark.App. 403, 19 S.W.3d 630, 633 (2000). Here, SWB contends the “hybrid” nature of calls placed to ISPs renders the agreement’s meaning uncertain — that is, although ISP-bound calls may “terminate” at an ISP’s geographical location within the same local exchange area, they may proceed from there to a website anywhere on the Internet.
I disagree the “hybrid” nature of ISP-bound calls is a collateral fact which renders uncertain the meaning of any of the terms in this particular agreement. The parties specifically chose to define the termination of local calls with reference to where they were “delivered,” which undis-putedly occurred at a specific geographical location irrespective of whether subsequent to “delivery” the calls continued on into cyberspace via the internet. The parties further unambiguously agreed that when phone calls were “delivered” within the same local exchange area where they were placed, such calls were local in nature and therefore subject to reciprocal compensation.
The only “collateral” event which occurred here (which appears to be the real reason SWB suddenly refused to pay Connect for ISP-bound calls) was the FCC’s subsequent ruling that calls placed to ISP providers were interstate in nature. See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, Intercarrier Comp. for ISP-Bound Traffic, 14 F.C.C.R. 3689, 1999 WL 98037 (Feb. 26, 1999) (Reciprocal Compensation Order). The FCC’s order was prospective in nature, however, as several courts have since noted. See Global NAPS, Inc. v. FCC, 291 F.3d 832, 834 (D.C.Cir.2002) (“However, the FCC’s Reciprocal Compensation Order left open the possibility that state regulators ... could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly.”); S. New England Tel. Co. v. State, Dep’t of Pub. Util. Co., 285 F.Supp.2d 252, 259 (D.Conn.2003) (‘While classifying the majority of ISP-bound traffic as interstate, the FCC left open the possibility that state regulators could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly. The FCC further acknowledged in its 1999 Ruling that it had historically directed state commissions to treat such calls as ‘local.’ ”) (internal citations and quotations omitted); see also Sw. *716 Bell Tel. Co. v. Brooks Fiber Commc’ns of Okla., Inc., 235 F.3d 493 (10th Cir.2000) (interpreting the very agreement at issue here and upholding the Oklahoma Corporation Commission’s determination that calls placed to ISPs within the same exchange area were local traffic subject to reciprocal compensation under the agreement).
Thus, even though ISP-bound calls have now been identified as interstate in nature, it is clear parties could choose by contract to identify such calls as local ones subject to reciprocal compensation. That is exactly what occurred here. The fact SWB now realizes it made a bad business judgment, which led to a written contract entered into in good faith by both parties to it, does not now justify its refusal to pay Connect pursuant to the unambiguous terms of the agreement in controversy.
For the reasons stated, I respectfully dissent.