# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 05-3698

_____

Connect Communications     *
Corporation,     *
    *
       Appellant,     *
    *
      v.     *
    *
Southwestern Bell Telephone, L.P.,     *     Appeal from the United States
formerly known as Southwestern     *     District Court for the
Bell Telephone Company;     *     Eastern District of Arkansas.
Arkansas Public Service     *
Commission; Sandra L.     *
Hochstetter, in her official capacity     *
as Chairman of the Arkansas Public     *
Service Commission; Daryl E.     *
Bassett, in his official capacity as     *
Commissioner of the Arkansas     *
Public Service Commission; Randy     *
Bynum, in his official capacity as     *
Commissioner of the Arkansas     *
Public Service Commission,     *
    *
       Appellees.     *

_____

Submitted: May 17, 2006
Filed: October 27, 2006

_____

Before BYE, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

This case involves telephone calls placed from Southwestern Bell Telephone Company (SWBT) telephone customers to the individual customer's internet service provider (ISP), where the ISP is a telephone customer of a different telephone company, Connect Communications Corporation (Connect). All the involved telephone customers are located within the same local exchange area. After the Arkansas Public Service Commission (APSC) approved an Interconnection Agreement between Connect and SWBT, the parties disputed whether these ISP-bound calls were local calls, which would subject them to reciprocal compensation under the Interconnection Agreement, or whether the calls were non-local. After years of litigation and several decisions at various administrative and judicial levels, the APSC determined that the ISP-bound calls were not local calls under the Interconnection Agreement. The district court[1] found that determination not to be arbitrary or capricious and upheld the APSC's decision. Connect appeals, and we affirm.

## I. Background

This litigation began in 1998, shortly after SWBT and Connect had entered into an Interconnection Agreement on June 23, 1997. SWBT, as an incumbent local exchange carrier (ILEC), had a duty to negotiate and enter into an interconnection agreement with Connect, a competitive local exchange carrier (CLEC), under the Telecommunications Act of 1996 (the Act). See 47 U.S.C. § 251(c)(1), (2). Rather than negotiate an interconnection agreement of its own with SWBT, Connect chose to adopt the interconnection agreement previously negotiated by SWBT with Brooks Fiber Communications of Arkansas, Inc. (Brooks Fiber) in August 1996, a procedure

---

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

allowed under the Act.  See 47 U.S.C. § 252(I); 47 C.F.R. § 51.809.  The APSC approved the SWBT-Connect Interconnection Agreement on October 24, 1997, and neither party sought review of the Interconnection Agreement in federal district court pursuant to 47 U.S.C. § 252(e)(6).

The Interconnection Agreement divides the telecommunications traffic between the two telephone companies into four categories: local traffic, through-put traffic, intraLATA interexchange traffic, and interLATA interexchange traffic.  (Appellant's Add. at 48.)  The Interconnection Agreement classifies "[c]alls originated by one Party's end users and terminated to the other Party's end users . . . as local traffic . . . if the call originates and terminates in the same SWBT exchange area" (id.) and provides for reciprocal compensation for the termination of local traffic (id. at 49).  Although the Interconnection Agreement does not define "terminate," it does define "terminating traffic" as "a voice-grade switched telecommunications service which is delivered to an end-user(s) as a result of another end user's attempt to establish communications between the parties."  (Id. at 57.)

At the time that SWBT and Connect were entering into the Interconnection Agreement, the FCC had not determined whether traffic transmitted to ISPs was subject to reciprocal compensation as local traffic under the Act or not.  In an FCC Order issued on May 16, 1997, the FCC noted that since an earlier ruling in 1983, ISPs had not been required to pay interstate access charges and were allowed to purchase services from ILECs under the same intrastate tariffs available to end users. See *In the Matter of Access Charge Reform Price Cap Performance Review for Local Exchange Carriers Transport Rate Structure and Pricing End User Common Line Charges*, 12 F.C.C.R. 15982, 16132-33 (FCC May 16, 1997) (hereinafter 1997 FCC Order).  The FCC concluded in the 1997 FCC Order "that the existing pricing structure for ISPs should remain in place."  Id. at 16133.  Thus, for tariff purposes, calls placed to ISPs were treated as local calls.  At that time, there was debate in the industry about whether ISPs acted more like end users, such that a call to an ISP is

terminated at the ISP's server, or more like interexchange carriers, providing a connection to the Internet. See id. at 16275 (discussing AOL's and PacTel's opposing arguments).

In 1999, the FCC determined that ISP-bound traffic was "largely interstate," but that this conclusion "does not in itself determine whether reciprocal compensation is due in any particular instance." See *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3690 (FCC Feb. 26, 1999) (ISP Declaratory Ruling). The FCC recognized that prior to this time, it had consistently treated enhanced service provider (ESP) traffic as local for purposes of interstate access charges despite its interstate character, and that parties may have agreed, or state commissions may have mandated, that reciprocal compensation applied to ISP-bound traffic. Thus, the FCC "conclude[d] that parties should be bound by their existing interconnection agreements, as interpreted by state commissions." Id. The FCC noted that in interpreting prior interconnection agreements, state commissions should consider all of the relevant facts, including the parties' negotiations in light of the FCC's "longstanding policy of treating this traffic as local, and the conduct of the parties pursuant to those agreements." Id. at 3704.

The D.C. Circuit vacated portions of the FCC's ISP Declaratory Ruling, concluding that the FCC did not adequately explain its reliance on an "end to end" jurisdictional analysis to support its conclusion that ISP-bound traffic was not local and thus not subject to reciprocal compensation. See Bell Atlantic Tel. Cos. v. FCC, 206 F.3d 1, 6-7 (D.C. Cir. 2000). On remand from the D.C. Circuit, the FCC again concluded that ISP-bound calls were not subject to reciprocal compensation, though under a different rationale. This time, the FCC concluded that Congress excluded traffic listed in 47 U.S.C. § 251(g) from telecommunications traffic subject to reciprocal compensation. One of the items included in § 251(g) is "information access," which the FCC determined included ISP-bound traffic. See *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act*

*of 1996*, 16 F.C.C.R. 9151, 9153 (FCC Apr. 27, 2001) (Remand Order). Again, the FCC reiterated that its order applied prospectively only to renegotiated or expiring interconnection agreements; "[i]t does not alter existing contractual obligations." Id. at 9189.

Once again, on appeal the D.C. Circuit remanded the case back to the FCC. See WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C. Cir. 2002). The court found the FCC's reliance on § 251(g) misplaced, as that section was merely a transitional device to preserve the status quo until the FCC could adopt rules to implement the Act. Id. The court did not vacate the FCC order, however, noting that there could be other legal bases to support the FCC's rule; it "simply remand[ed] the case to the [FCC] for further proceedings." Id. at 434.

Turning back to the case at hand, SWBT informed Connect in March 1998 that it would not compensate Connect for suspected ISP-bound traffic as a local call under the Interconnection Agreement's reciprocal compensation arrangement. On June 5, 1998, Connect filed a complaint with the APSC seeking a declaration that the ISP-bound traffic was subject to the reciprocal compensation provisions for local traffic under the Interconnection Agreement. The APSC issued its order on December 31, 1998, and, relying heavily on FCC decisions and the district court's analysis in Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex., No. MO 98 CA043 (W.D. Tex. June 16, 1998), aff'd, 208 F.3d 475 (5th Cir. 2000), determined that a call from a SWBT customer to an ISP served by Connect within the same local calling area is a local call subject to reciprocal compensation. (J.A. at 90, 95-96, APSC Order #6.) The APSC also noted that twenty-three state commissions had found similar ISP-bound traffic to be local. (Id. at 90.) SWBT challenged that decision by filing suit in federal district court, naming Connect and the APSC as defendants and seeking injunctive relief to prohibit enforcement of the APSC Order #6. The district court determined that it lacked jurisdiction to review a state commission's order interpreting and enforcing an interconnection agreement because the Telecommunications Act grants

federal district courts jurisdiction only to determine whether interconnection agreements meet the requirements of federal law. Sw. Bell Tel. Co. v. Connect Commc'ns Corp., 72 F. Supp. 2d 1043, (E.D. Ark. 1999) (SWBT I). On appeal, a panel of this court reversed the district court, holding that the claim raised substantial federal law questions. Sw. Bell Tel. Co. v. Connect Commc'ns Corp., 225 F.3d 942, 948 (8th Cir. 2000) (SWBT II). The panel did not reach the merits of the federal law claim, but remanded to the district court to address these issues. Id. at 949.

On remand, the district court discussed the FCC orders that had been issued since the case at bar was originally before the district court, namely the FCC's 1999 ISP Declaratory Order and the FCC's 2001 Remand Order. These were contrary to the FCC's earlier position, which treated ISP traffic as local for tariff purposes, and which was the most current FCC pronouncement at the time that the APSC first issued its determination that the ISP traffic at issue here was subject to reciprocal compensation. The district court noted that the FCC has now taken the position that ISP traffic is "information access" within the meaning of 47 U.S.C. § 251(g), and that Congress intended to exclude traffic listed in § 251(g) from the reciprocal compensation requirements of § 251(b)(5).[2] The district court noted, however, that the FCC Remand Order allowed the payment of reciprocal compensation for ISP-bound traffic to the extent provided for in an existing interconnection agreement. Finding that the APSC based its prior ruling on federal regulations and FCC rulings, which turned out to be incorrect according to the latest FCC rulings, but that the APSC failed to interpret the Interconnection Agreement pursuant to state contract law, the district court remanded the case to the APSC "for reconsideration in light of the FCC Remand Order and the statements made herein." (J.A. at 113.).

_____

[2]This decision was issued by the district court prior to the D.C. Circuit's WorldCom opinion holding that § 251 was a transitional provision and did not control the issue.

-6-

On remand from the district court, the APSC issued Order #10, in which it considered the existing record and determined that the Interconnection Agreement was ambiguous as to whether the parties intended for ISP-bound calls to be subject to reciprocal compensation. Applying Arkansas contract law and looking for the intent of the parties, the APSC determined that SWBT clearly did not intend to subject ISP-bound traffic to reciprocal compensation when it entered into the Interconnection Agreement; that the record lacked any evidence of Connect's intent one way or the other regarding this specific traffic when it entered into the Interconnection Agreement; and that ISP-bound traffic was generally accepted in the industry as being "jurisdictionally interstate." The APSC then considered the FCC Remand Order, as it was directed to do by the district court, which, according to the APSC, "clearly designates ISP-bound traffic as interstate." (Appellant's Add. at 29.) Based on all of these considerations, the APSC determined that the Interconnection Agreement did not require payment of reciprocal compensation for ISP-bound traffic.[3]

This time, Connect challenged the agency decision by bringing a complaint in federal district court, seeking a declaratory ruling that the APSC Order #10 misapplied

---

[3]Following the APSC's first order, SWBT began paying reciprocal compensation to Connect for ISP-bound traffic. SWBT filed a separate claim alleging that Connect was creating fictitious local call activity by using a Lucent Max device to provide broadband internet service to its customers. The APSC issued Order #11, in which it ordered Connect to make an accounting of the reciprocal compensation that Connect received from SWBT based on calls made using the Lucent Max device, reasoning that whether the calls created fraudulent fictitious local call activity, as alleged by SWBT, or were legitimate ISP-bound traffic, they would not be subject to reciprocal compensation based on Order #10. In Order #12, the APSC denied Connect's motion to reconsider Order #11, noting that it would need to revisit the issue only if it was ultimately determined that the ISP-bound traffic was indeed subject to reciprocal compensation. The district court construed its judgment as disposing of the entire case. Because we affirm the district court's decision upholding the APSC's conclusion that the ISP-bound traffic is not subject to reciprocal compensation, we need not address Orders #11 or #12.

federal law, violated the district court mandate, violated Arkansas law, and was arbitrary and capricious. Ruling from the bench, the district court found a latent ambiguity in the Interconnection Agreement and determined that the APSC did not act arbitrarily or capriciously in finding an ambiguity in the agreement. The district court then determined, based on the original record before the APSC, that the APSC's determination that the parties did not intend to subject ISP-bound traffic to reciprocal compensation was likewise not arbitrary or capricious. The court entered judgment in favor of SWBT on September 2, 2005.

Connect appeals, arguing that the Interconnection Agreement is not ambiguous, and even if it is, the ambiguity should be resolved in its favor.

## II. Standard of Review

The district court had jurisdiction over Connect's complaint seeking declaratory relief against the APSC's decision as a misapplication of federal law pursuant to 28 U.S.C. § 1331. See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 643-44 (2002). It also had supplemental jurisdiction to review the agency's state law determinations. 28 U.S.C. § 1367(a); Qwest Corp. v. Minn. Pub. Utils. Comm'n, 427 F.3d 1061, 1064 (8th Cir. 2005) (Qwest v. MPUC) (exercising supplemental jurisdiction over a claim that the MPUC acted beyond its statutory authority); Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc., 235 F.3d 493, 498 (10th Cir. 2000) (exercising supplemental jurisdiction over state law claims in action seeking review of Oklahoma Corporation Commission's interpretation of interconnection agreement) (hereinafter Brooks Fiber). We review the district court's grant of summary judgment de novo, applying the same standard used by the district court. Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005).

We review the APSC's decision for compliance with federal law de novo. See Qwest v. MPUC, 427 F.3d at 1064. Although federal law plays a large role in this

dispute, the ultimate issue in this case--interpretation of the Interconnection Agreement--is a state law issue.  See Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex., 208 F.3d 475, 485 (5th Cir. 2000)  ("[T]he agreements themselves and state law principles govern the questions of interpretation of the contracts and enforcement of their provisions.").  Although the parties agree that we review the APSC's factual findings related to any state law issues under an arbitrary and capricious standard, see id., they dispute the level of deference owed to the APSC's application of state law. The APSC determined that the Interconnection Agreement was ambiguous, which generally is a legal conclusion under Arkansas law.  See Hisaw v. State Farm Mut. Auto. Ins. Co., 122 S.W.3d 1, 8 (Ark. 2003).[4]  Connect urges a de novo review of that determination, while SWBT argues for an arbitrary and capricious review.

---

[4]Even this conclusion is far from clear.  The district court found the ambiguity to be latent, meaning that the ambiguity "arises from undisclosed facts or uncertainties of the written instrument."  Jet Asphalt & Rock Co., Inc. v. Angelo Iafrate Constr., LLC, 431 F.3d 613, 617 (8th Cir. 2005) (applying Arkansas law) (internal marks omitted). With respect, we conclude that the Supreme Court of Arkansas has not been entirely consistent in its characterization of latent ambiguities as a legal or factual determination.  Compare Countryside Cas. Co. v. Grant, 601 S.W.2d 875, 877 (Ark. 1980) ("[W]e view the trial court's finding of latent ambiguity . . . as primarily [a] question[] of fact, [and] we shall not reverse the trial court unless its judgment is clearly erroneous."), with C. & A. Constr. Co., Inc. v. Benning Constr. Co., 509 S.W.2d 302, 303 (Ark. 1974) ("[A] latent ambiguity arises from undisclosed facts or uncertainties of the written instrument.  However, the initial determination of the existence of an ambiguity rests with the court." (internal citations omitted)); see also Nichols v. Farmers Ins. Co., 128 S.W.3d 1, 4 (Ark. Ct. App. 2003) ("[W]here the . . . ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law. . . . [W]here the parties go beyond the contract and submit disputed extrinsic evidence . . ., this is a question of fact for the jury." (internal citations omitted)).  The APSC did not clarify whether it found the ambiguity to be patent or latent, though it appears from its reasoning that it found it to be a latent ambiguity.

In our prior panel opinion in this case, we noted that "[w]ith regard to purely state law issues, the state commissions may have the final say." SWBT II, 225 F.3d at 948 (citing P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 13-15 (1st Cir. 1999) (holding that § 252(e)(6) does not confer jurisdiction on federal courts to review state agency action for compliance with state law)). Since that time, several circuits have addressed the issue and have determined that federal courts can review state commission determinations of state law, giving deference to the state agency's expertise in making state law determinations. See Global NAPs, Inc. v. Verizon New Eng., Inc., 454 F.3d 91, 96 (2d Cir. 2006) ("[W]e review the Board's decisions as congruent with state law under the arbitrary-and-capricious standard."); Sw. Bell Tel. Co., 208 F.3d at 482 (reviewing the state agency's "state law determinations . . . under the more deferential arbitrary-and-capricious standard"); Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc., 339 F.3d 428, 433 (6th Cir. 2003) (noting "the inherent logic of . . . allowing state agencies wider deference in state law determinations"); US West Commc'ns v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999) ("[We] consider[] all other issues under an arbitrary and capricious standard"), cert. denied, 530 U.S. 1284 (2000); Brooks Fiber, 235 F.3d at 498 (reviewing all state law determinations made by a state agency under arbitrary and capricious standard).

In this circuit, we recently held that "in recognition of the state commission's superior technical expertise, we review its factual determinations under the arbitrary and capricious standard." Qwest Corp. v. Koppendrayer, 436 F.3d 859, 863 (8th Cir. 2006). We were not called upon, and therefore did not decide, what level of deference was owed to the state commission's determinations of state law. Connect relies on our statement in Qwest v. MPUC that "whether an agency acts within its statutory authority is a question of law [we review] de novo," 427 F.3d at 1064, to urge us to apply de novo review to APSC's application of Arkansas law.

We believe that the de novo standard applied in Qwest v. MPUC does not compel a similar review of the APSC's review of the state law issues in this case. In

Qwest v. MPUC, we were reviewing the agency's actions for consistency with its authority to act under state law. It would not have made sense to give deference to the agency's legal conclusions when the legal conclusions being challenged involved the agency's own authority under state law even to act.

Nevertheless, we need not wade through this standard of review quagmire, for regardless of the standard applied, we believe that the Interconnection Agreement contains a latent ambiguity as discussed more fully below, and we proceed to determine whether the APSC acted arbitrarily or capriciously in settling the ambiguity. See Starpower Commc'ns, LLC v. FCC, 334 F.3d 1150, 1155 (D.C. Cir. 2003) (declining to settle a dispute over the proper standard of review "because the contracts are so far from clearly unambiguous that we would resolve this issue in the same manner regardless whether we owe the Commission any deference").

### III. Is the Interconnection Agreement Ambiguous?

"[A] latent ambiguity arises when the contract on its face appears clear and unambiguous, but collateral facts exist that make the contract's meaning uncertain." Norman v. Norman, 970 S.W.2d 270, 274 (Ark. 1998); see also Coble v. Sexton, 27 S.W.3d 759, 761 (Ark. Ct. App. 2000) ("[A] latent ambiguity arises from undisclosed facts or uncertainties of the written instrument."); Richard A. Lord, 11 Williston on Contracts, § 33:40 (4th ed. 1999) (A latent ambiguity is one which "appear[s] only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings."). For example, a contract may include a clear description of the property to which it pertains, but extrinsic evidence reveals that the description applies to more than one estate. See Norman, 970 S.W.2d at 274; see also Abbott v. Abbott, 90 S.W.3d 10, 15-16 (Ark. Ct. App. 2002) (finding a latent ambiguity in a divorce decree that referred to "retirement" when husband's employer had three types of retirement plans, and it was unclear to which plan the decree referred); Barry v. Barry, 78 F.3d 375, 382 (8th Cir. 1996) (finding a latent

-11-

ambiguity in the meaning of the term "sale" in the context of selling shares of stock back to a corporation where the parties disputed whether a sale required an actual transfer of control, and both parties' interpretations were plausible).

In this case, the Interconnection Agreement is clear on its face that local traffic is subject to reciprocal compensation. An ambiguity arises, however, when the parties try to define local traffic to either include or exclude ISP-bound traffic. Similar to the interconnection agreements at issue in Starpower, "[t]he ambiguity in the [Connect-SWBT] agreement[] arises from the hybrid nature of a call to an ISP and the failure of the parties expressly to state whether ISP-bound traffic should be treated as local or non-local." Starpower Commc'ns, 334 F.3d at 1155. The Interconnection Agreement does not address ISP-bound traffic at all. It defines "local traffic" as traffic originating and terminating within the same SWBT exchange area. Connect claims that ISP-bound traffic clearly falls within this definition of local traffic because the call terminates at the ISP provider's location within SWBT's exchange area. SWBT counters that the calls do not "terminate" at the ISP provider's location at all, but continue on to the internet websites ultimately accessed by the calling party's computer. This dispute is not resolved by the Interconnection Agreement, which does not define the term "terminating." Although the Interconnection Agreement does define "terminating traffic" as "a voice-grade switched communications service which is delivered to an end-user(s) as a result of another end user's attempt to establish communications between the parties" (Appellant's Add. at 57), that definition likewise does not address the issues raised by ISP-bound calls. The parties legitimately dispute whether the end user initiating the call is attempting to establish communications with the ISP-provider, which is within the local exchange area, or with the world wide web, which clearly is not.

Although the terms "local traffic" and "terminating traffic" are defined in the Agreement, once extrinsic evidence of the nature of ISP-bound calls is considered, it becomes unclear whether ISP-bound traffic "terminates" within the local calling area

as contemplated by the Interconnection Agreement. Given the dispute within the industry at the time and both parties' plausible interpretations of where traffic terminates in an ISP-bound call, we conclude that the Interconnection Agreement contains a latent ambiguity that must be resolved by extrinsic evidence.

## IV. Is the APSC's Decision Arbitrary and Capricious?

Having determined that the Interconnection Agreement contains a latent ambiguity, we must determine then whether the APSC acted arbitrarily or capriciously in finding that the parties' intent was to treat the ISP-bound traffic as non-local and thus not subject to reciprocal compensation. See Qwest v. MPUC, 427 F.3d at 1064 (reviewing state agency fact determinations under arbitrary and capricious standard). This "scope of review 'is narrow and a court is not to substitute its judgment for that of the agency.'" In re: Core Commc'ns, Inc., 455 F.3d 267, 277 (D.C. Cir. 2006) (quoting Cellular Telecomms. & Internet Ass'n v. FCC, 330 F.3d 502, 507 (D.C. Cir. 2003), which applied the arbitrary and capricious standard to the FCC's order denying a petition for forbearance). "The [state] agency must, however, 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Under Arkansas law, "the polestar of contractual construction is to determine and enforce the intent of the parties . . . at the time the contract was made." Taylor v. Hinkle, No. 04-471, 2004 WL 2904681, at *7 (Ark. Dec. 16, 2004) (internal citations omitted); see also Moss v. Allstate Ins. Co., 776 S.W.2d 831, 834 (Ark. Ct. App. 1989). "[C]ourts may consider and accord considerable weight to the construction of an ambiguous [contract] by the parties themselves, evidenced by subsequent statements, acts, and conduct." Bishop v. City of Fayetteville, 97 S.W.3d 913, 919 (Ark. Ct. App. 2003); see also Taylor, 2004 WL 2904681 at *8 (considering subsequent conduct of parties in ascertaining parties' intent in entering into a contract).

-13-

The APSC also had "an obligation to interpret the Agreement within the bounds of existing federal law."  Brooks Fiber, 235 F.3d at 499.  "[T]he present telecommunications landscape makes clear that existing interconnection agreements 'requiring payment of reciprocal compensation for calls to ISPs do not conflict with §§ 251 and 252 of the Act or with the FCC's regulations or rulings.'" Mich. Bell Tel. Co., 339 F.3d at 436 (quoting Sw. Bell Tel. Co., 208 F.3d at 483).

The APSC determined that the parties did not intend to treat ISP-bound traffic as local traffic based on evidence of SWBT's intentions and actions around the time of the contract and the lack of any evidence about Connect's intent, since it merely adopted another parties' agreement and offered no evidence of its intent at the time it adopted the Interconnection Agreement.  The APSC also relied on the fact that "ISP-bound traffic was generally accepted in the industry as being jurisdictionally interstate."  (Appellant's Add. at 28-29.)  Since 1983, the FCC has recognized that ISP-bound traffic is under its jurisdiction as interstate traffic, but exempted the traffic from access charges generally applicable to interstate traffic.  Both sides use these FCC findings to support their positions: SWBT says the traffic is clearly interstate or the FCC would not have had jurisdiction to exempt it from access charges, while Connect argues that because it is treated as local traffic for purposes of access charges, it should be treated as local traffic for purposes of reciprocal compensation.

It is clear from the record that during the time that Connect and SWBT negotiated and entered into the Interconnection Agreement at issue here, there was significant debate in the industry about whether or not ISP-bound traffic was to be treated as local traffic for purposes of reciprocal compensation.  In June 1997, SWBT sent letters to CLECs with which it had interconnection agreements, explaining its position that the access charge exemption issued by the FCC did not change the jurisdictional nature of ISP-bound traffic as interstate traffic, and that SWBT did not believe that ISP-bound traffic was subject to reciprocal compensation under local interconnection agreements. (See J.A. at 449-50 (copy of June 9, 1997, letter to Time

Warner Communications).) During the same time frame, the Association for Local Telecommunications sought an expedited letter clarification from the Common Carrier Bureau to the effect that the FCC's Local Competition Order did not "alter[] the [FCC's] long standing rule that calls to an Information Service Provider ("ISP") made from within a local calling area must be treated as local calls by any and all LECs involved in carrying those calls." (Id. at 610-13 (copy of June 20, 1997, Request for Expedited Letter Clarification).)

Considering the parties' actions following implementation of the Interconnection Agreement, the evidence reveals that SWBT never paid reciprocal compensation to Connect for ISP-bound traffic under the Interconnection Agreement, even prior to the time SWBT notified Connect of its position regarding the traffic, until it was ordered to do so by the APSC in Order #6. (Id. at 197, testimony of Paul L. Cooper.) L. Bruce Sparling, who negotiated interconnection agreements for SWBT, including the Interconnection Agreement with Connect, testified that at the time that SWBT entered into the Interconnection Agreement with Connect, SWBT did not intend reciprocal compensation to apply to the traffic now at issue. (Id. at 324, Rebuttal Testimony of L. Bruce Sparling.) Mr. Sparling also testified that SWBT would not have agreed to pay reciprocal compensation for ISP-bound traffic at the time of negotiations even if Connect had requested it because SWBT considered internet traffic to be jurisdictionally interstate, and SWBT was already losing the access charge revenue pursuant to the FCC's exemption. (Id. at 326.) Connect offered no evidence about its intentions at the time it entered into the Interconnection Agreement. Its evidence revolved around the issue of whether ISP-bound traffic in fact terminated at the ISP's server within the local area.

If this were all there was to the APSC's resolution of the ambiguity in the agreement, we would easily uphold its decision as not arbitrary or capricious. Given the evidence about the intent of the parties, their subsequent actions, and the ongoing debate within the industry at the time the Interconnection Agreement was adopted, we

cannot say that the APSC's decision that the parties did not intend to apply reciprocal compensation to ISP-bound traffic was arbitrary or capricious. The APSC did more than consider the events surrounding adoption of the Interconnection Agreement, however. It also considered (and understandably so given the district court's remand order) the FCC's Remand Order, which, according to the APSC, "clearly designates ISP-bound traffic as interstate." (Appellant's Add. at 29.) The FCC Remand Order was issued in 2001, long after the parties entered into the Interconnection Agreement. Because we are focused on the parties' intentions at the time of contracting in 1997, "the *ISP Remand Order* result should have no bearing on the present dispute that predates that ruling." Mich. Bell Tel. Co., 339 F.3d at 435.

While the district court's reliance on the irrelevant ISP Remand Order gives us pause, it does not render the APSC's decision arbitrary and capricious in this case. At most, it reinforces the ongoing debate within the industry about the nature of these calls. In the ISP Remand Order, the FCC continued to reinforce, as it had in earlier rulings, that parties should be bound by their existing interconnection agreements as interpreted by state commissions. Although its rationale in the ISP Remand Order was different under the Act than previous orders, it had already concluded in 1997 that ISP-bound traffic was jurisdictionally interstate. Given the evidence favoring SWBT's position at the time of contracting, and the lack of evidence of Connect's intent, the APSC's consideration of the subsequent FCC order did not make its determination arbitrary and capricious.

Finally, we recognize that the Oklahoma Corporation Commission (OCC) determined that the Brooks Fiber Interconnection Agreement that was adopted by Connect required SWBT to pay reciprocal compensation to Brooks Fiber for ISP-bound traffic, and that the Tenth Circuit upheld that decision under an arbitrary and capricious review. See Brooks Fiber, 235 F.3d at 498, 501. The fact that the Tenth Circuit upheld the OCC's ruling that the identical agreement between SWBT and Brooks Fiber requires reciprocal compensation does not make the APSC's contrary

-16-

decision in this case arbitrary or capricious. <u>See</u> <u>Global NAPs, Inc. v. Mass. Dep't of</u> <u>Telecomms. & Energy</u>, 427 F.3d 34, 48 (1st Cir. 2005) (recognizing that state commissions are not bound by decisions reached by other state commissions, even in construing similar or identical terms). The interpretation of interconnection agreements rightly belongs to the state commissions, and we will not overturn one in favor of another without the showing of an arbitrary or capricious decision. Reasoned decisions reaching opposite conclusions do not <u>ipso facto</u> prove that either is arbitrary or capricious.

## V. Conclusion

The APSC's decision is not arbitrary and capricious, and the district court's judgment is affirmed.

BYE, Circuit Judge, dissenting.

Because the Arkansas Public Service Commission (APSC) did not determine the existence of a latent ambiguity in the Interconnection Agreement at issue, I do not believe its decision is entitled to any deference under an arbitrary-and-capricious standard of review. Further, I cannot detect a latent ambiguity in the Interconnection Agreement, and therefore do not believe the APSC's decision can stand even under the more deferential arbitrary-and-capricious standard. For those reasons, I would reverse the district court's judgment, and respectfully dissent.

The Court states: "The APSC did not clarify whether it found the ambiguity to be patent or latent, though it appears from its reasoning that it found it to be a latent ambiguity." <u>Ante</u> at 9 n.4. I cannot draw the same conclusion as to the APSC's reasoning. Rather, it seems clear the notion of a latent ambiguity was only interjected into this case by the district court as an after-the-fact attempt to justify the APSC's

-17-

flawed and conclusory reasoning finding an ambiguity in the Interconnection Agreement.

The following is the sum and substance of the APSC's reasoning to support its determination the Interconnection Agreement was ambiguous:

> Although both Connect and SWBT argue that there is no ambiguity in their Interconnection Agreement, the parties interpret the contract to reach diametrically opposed results. This fact, coupled with a comparison of the Interconnection Agreement at issue in this docket and the contracts reviewed in <u>Starpower v. FCC</u>, [334 F.3d 1150 (D.C. Cir. 2003),] together with the D.C. Circuit's holding that the contracts in that case were clearly ambiguous, support the conclusion that the Connect-SWBT Interconnection Agreement at issue is ambiguous.

Appellant's Add. at 23-24.

Thus, the APSC gave two "reasons" for its decision. The first was the agreement must be ambiguous simply because "the parties interpret the contract to reach diametrically opposed results." This reasoning is obviously arbitrary and capricious. Such a rule would mean ambiguity turns on the parties' arguments rather than a contract's terms, thereby rendering *every* disputed contract ambiguous. This makes no sense.

Second, the APSC relied upon the D.C. Circuit's interpretation of an interconnection agreement in <u>Starpower Commc'ns, LLC v. FCC</u>, 334 F.3d 1150 (D.C. Cir. 2003). A mere cursory examination of <u>Starpower</u> reveals the arbitrary and capricious nature of the APSC's reasoning. In <u>Starpower</u>, the FCC issued an order indicating interconnection agreements between Starpower and Verizon Virginia, Inc., were unambiguous, and thus Verizon did not have to pay Starpower for ISP-bound traffic as local traffic under the agreement. Focusing on the agreement's use of the

phrase "end-to-end," the D.C. Circuit disagreed, concluding the parties' agreements were

> models of ambiguity with respect to reciprocal compensation for ISP-bound traffic. Certain terms, such as "local traffic" and "terminate," could readily support an interpretation that would require Verizon and Starpower to compensate each other for ISP-bound traffic. At the same time, the term "end-to-end" in § 5.7.5 of the 1998 Agreement and in §§ 4.1 and 4.2 of the 1999 agreement implies that the Commission's jurisdictional end-to-end analysis controls, so that reciprocal compensation is not due. Thus, the agreements are susceptible to two meanings, and the Commission erred in holding the agreements unambiguously exclude ISP-bound traffic.

Starpower, 334 F.3d at 1157.

The D.C. Circuit focused exclusively upon the agreement's use of the term "end-to-end" as the language which created an ambiguity. Starpower has absolutely no bearing on the interconnection agreement at issue in this case, because nowhere does this agreement use the term "end-to-end," or anywhere else incorporate the FCC's jurisdictional end-to-end analysis for determining the interstate or local nature of a given call.

Because both "reasons" given by the APSC for finding an ambiguity in the agreement are fundamentally flawed, I see no reason to pay its decision any deference whatsoever.

Reviewing the APSC's decision de novo, as I believe we should, see Qwest Corp. v. Minn. Pub. Utils. Comm'n, 427 F.3d 1061, 1064 (8th Cir. 2005) (reviewing de novo whether a state agency acts within its authority in implementing the Telecommunications Act of 1996); see also Western World Ins. Co. v. Branch, 965 S.W.2d 760, 761 (Ark. 1998) (indicating the question whether a contract is ambiguous

is a question of law), I can find no ambiguity in the interconnection agreement between Southwestern Bell (SWB) and Connect Communications.

Under Arkansas law, the language contained in the contract is the best evidence of the parties' intention.  First Nat'l Bank v. Griffin, 832 S.W.2d 816, 818-19 (Ark. 1992).  "When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed."  Surratt v. Surratt, 148 S.W.3d 761, 768 (Ark. Ct. App. 2004).

Under the plain and unambiguous language of the agreement, calls placed from SWB's customers to internet service providers (ISPs) within the same SWB exchange were defined as local calls for which SWB agreed to pay Connect reciprocal compensation.  The contract language defines traffic as terminating when it is "delivered."  See Add. at 57 (defining "Terminating Traffic" as a "telecommunications service which is delivered to an end user(s) as a result of another end user's attempt to establish communication between the parties.").  It is undisputed the calls at issue were delivered, and therefore terminated, to Connect end users (ISPs) at a geographical location within the same local exchange area.  SWB clearly agreed to compensate Connect for such calls.  See Add. at 49 ("SWBT agrees to compensate CONNECT for the termination of SWBT Local Traffic originated by SWBT end users in the SWBT exchanges described in Appendix DCO and terminating to CONNECT end users.").

"A latent ambiguity arises [only] when the contract on its face appears clear and unambiguous, but collateral facts exist that make the contract's meaning uncertain." Oliver v. Oliver, 19 S.W.3d 630, 633 (Ark. Ct. App. 2000).  Here, SWB contends the "hybrid" nature of calls placed to ISPs renders the agreement's meaning uncertain – that is, although ISP-bound calls may "terminate" at an ISP's geographical location

within the same local exchange area, they may proceed from there to a website anywhere on the Internet.

I disagree the "hybrid" nature of ISP-bound calls is a collateral fact which renders uncertain the meaning of any of the terms in this particular agreement. The parties specifically chose to define the termination of local calls with reference to where they were "delivered," which undisputedly occurred at a specific geographical location irrespective of whether subsequent to "delivery" the calls continued on into cyberspace via the internet. The parties further unambiguously agreed that when phone calls were "delivered" within the same local exchange area where they were placed, such calls were local in nature and therefore subject to reciprocal compensation.

The only "collateral" event which occurred here (which appears to be the real reason SWB suddenly refused to pay Connect for ISP-bound calls) was the FCC's subsequent ruling that calls placed to ISP providers were interstate in nature. See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, Intercarrier Comp. for ISP-Bound Traffic, 14 F.C.C.R. 3689, 1999 WL 98037 (Feb. 26, 1999) (Reciprocal Compensation Order). The FCC's order was *prospective* in nature, however, as several courts have since noted. See Global NAPS, Inc. v. FCC, 291 F.3d 832, 834 (D.C. Cir. 2002) ("However, the FCC's Reciprocal Compensation Order left open the possibility that state regulators . . . could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly."); S. New England Tel. Co. v. Conn. Dep't of Pub. Util. Co., 285 F. Supp. 2d 252, 259 (D. Conn. 2003) ("While classifying the majority of ISP-bound traffic as interstate, the FCC left open the possibility that state regulators could continue to treat ISP-bound traffic as local traffic, if interconnection agreements between carriers so provided, whether explicitly or implicitly. The FCC further acknowledged in its 1999 Ruling that it had historically directed state commissions to treat such calls as 'local.'") (internal citations

and quotations omitted); <u>see also</u> <u>Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.</u>, 235 F.3d 493 (10th Cir. 2000) (interpreting the very agreement at issue here and upholding the Oklahoma Corporation Commission's determination that calls placed to ISPs within the same exchange area were local traffic subject to reciprocal compensation under the agreement).

Thus, even though ISP-bound calls have now been identified as interstate in nature, it is clear parties could choose *by contract* to identify such calls as local ones subject to reciprocal compensation. That is exactly what occurred here. The fact SWB now realizes it made a bad business judgment, which led to a written contract entered into in good faith by both parties to it, does not now justify its refusal to pay Connect pursuant to the unambiguous terms of the agreement in controversy.

For the reasons stated, I respectfully dissent.

_____